**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION<br>　　125 Broad Street – 18th Floor<br>　　New York, NY 10004,<br><br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>　　125 Broad Street – 18th Floor<br>　　New York, NY 10004,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>DEPARTMENT OF DEFENSE<br>　　1000 Defense Pentagon<br>　　Washington, DC 20301,<br><br>DEPARTMENT OF JUSTICE<br>　　950 Pennsylvania Avenue, NW<br>　　Washington, DC 20530,<br><br>CENTRAL INTELLIGENCE AGENCY<br>　　Information and Privacy Coordinator,<br>　　Washington, DC 20505,<br><br>and DEPARTMENT OF STATE<br>　　2201 C Street, NW<br>　　Washington, DC 20520,<br><br>　　　　*Defendants*. | Case No. 1:23-cv-00644 |

## INTRODUCTION

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for injunctive and other appropriate relief. Plaintiffs the American Civil Liberties Union and the American Civil Liberties Union Foundation (together, the "ACLU") seek the immediate processing and timely release of agency records from Defendants Department of Defense ("DOD"), Central Intelligence Agency ("CIA"), Department of Justice ("DOJ"), and Department of State ("State Department").

2. On December 8, 2022, Plaintiffs submitted a FOIA request (the "Request") to DOD, CIA, DOJ, and the State Department seeking the current administration's rules governing the use of lethal force and capture operations abroad, as set out in the "Presidential Policy Memorandum" ("PPM"), as well as any memoranda related to the president's "authorities to use force" under domestic and international law.[1] The PPM rules replace a Trump administration policy, publicly released in 2021, called the "Principles, Standards, and Procedures," or "PSP," and its predecessor Obama administration policy, publicly released in 2016, called the "Presidential Policy Guidance," or "PPG."

3. While the government eventually published both the PPG and PSP, the PPM remains entirely secret.

4. The PPM, like its predecessor public policies, regulates the executive branch's legally contested and publicly controversial use of lethal force against terrorism suspects outside of recognized war zones. Credible media and independent rights groups' reports show that, under past and current rules, the executive branch's lethal force program has killed or injured thousands of civilians in multiple parts of the world. The new PPM rules are likely to have disastrous human

---

[1] A copy of the Request is attached hereto as Exhibit 1.

1

rights consequences for countries in which the lethal force program operates, and it will further entrench an era of forever wars without Congressional authorization.

5. Public disclosure of the PPM is particularly urgent now because media reports indicate that U.S. use of lethal force abroad is once again increasing. Although the PPM restores certain safeguards against civilian harm from the Obama-era PPG that the Trump administration eliminated in the PSP, the PPM contains exceptions and loopholes that risk undermining the very protections it purports to create. *See* Charlie Savage, *White House Tightens Rules on Counterterrorism Drone Strikes*, N.Y. Times (Oct. 10, 2022), https://www.nytimes.com/2022/10/07/us/politics/drone-strikes-biden-trump.html ("Savage Article"). For example, the PPM does not require White House approval for U.S. strikes conducted under a novel legal theory of "collective self-defense" of partner forces outside of recognized battlefields. This theory is the Defense Department's public legal justification for a number of increased strikes in, for example, Somalia. Strikes in Yemen also appear to have resumed after a hiatus of almost three months, and a period of decline that began in 2018. *See* Ahmed Al-Haj and Jon Gambrell, *Mystery Yemen Drone Strike Renews Questions Over US Campaign*, AP News (Feb. 10, 2023), https://apnews.com/article/al-qaida-ayman-zawahri-united-states-government-military-technology-yemen-860d86430603dc36ea786e72e09438c1?utm_source=P%26S%3A+Drone+News+Roundup+%E2%80%94+All&utm_campaign=993ab3fd16-EMAIL_CAMPAIGN_2018_08_01_04_01_COPY_01&utm_medium=email&utm_term=0_066db1cbcd-993ab3fd16-391821397; *US Forces in Yemen*, Airwars, https://airwars.org/conflict/us-forces-in-yemen (tracking live statistics of the war in Yemen).

6. The Request seeks information necessary for the public to fully understand the Biden administration's policies governing the use of lethal force abroad and how those rules differ from the public policies of the last two administrations.

7. To date, none of the Defendants has released any responsive record.

8. Plaintiffs now ask the Court for an injunction requiring Defendants to process the Request immediately. Plaintiffs also seek an order enjoining Defendants from assessing fees for the processing of the Request.

**JURISDICTION AND VENUE**

9. The Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B), (a)(6)(E)(iii). The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706.

10. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

**PARTIES**

11. Plaintiff American Civil Liberties Union is a nationwide, non-profit, nonpartisan 26 U.S.C. § 501(c)(4) organization, incorporated in the District of Columbia and with its principal place of business in New York City. The American Civil Liberties Union's mission is to maintain and advance civil rights and civil liberties and to ensure that the U.S. government acts in compliance with the Constitution and laws of the United States. The American Civil Liberties Union is also committed to principles of transparency and accountability in government, and seeks to ensure that the American public is informed about the conduct of its government in matters that affect civil liberties and human rights. Obtaining information about governmental activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the American Civil Liberties Union's work and one of its primary activities.

12. Plaintiff American Civil Liberties Union Foundation is a separate 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal

3

representation free of charge in cases involving civil liberties. It is incorporated in New York State and its principal place of business is in New York City.

13. Defendant DOD is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). The Office of the Secretary of Defense and Joint Staff, from which the ACLU requested records, is a component of DOD.

14. Defendant CIA is an intelligence agency established within the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

15. Defendant DOJ is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). The Office of Legal Counsel, the Office of Information Policy, the Office of the Attorney General, the Office of the Deputy Attorney General, and the National Security Division, from which the ACLU requested records, are components of DOJ.

16. Defendant State Department is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTUAL BACKGROUND

### Executive Branch Rules Governing the Use of Lethal Force Abroad

17. In 2002, the U.S. government began conducting lethal strikes outside recognized battlefields abroad, including through the use of armed drones. What began with a single drone strike in Yemen burgeoned into the U.S.'s full-fledged programmatic use of lethal strikes outside of recognized war zones in multiple parts of the world.

18. Successive presidents have unilaterally claimed the authority to use lethal force without Congressional authorization in countries including Pakistan, Yemen, Libya, Somalia, Niger, and elsewhere, raising profoundly important constitutional separation of powers and human

rights concerns. Administrations of both political parties have now carried out many hundreds of strikes under this program, killing thousands of civilians in the process. Most recently, the U.S. has intensified its use of lethal strikes in Somalia, launching 20 reported strikes there during 2022, and 16 strikes in 2023 so far. *See US Forces in Somalia*, Airwars, https://airwars.org/conflict/us-forces-in-somalia (last visited Mar. 8, 2023) (tracking live statistics of the war in Somalia).

19. For years, the executive branch operated its lethal strike program without formal rules and outside the public eye. In May 2013, after years of promises to provide greater transparency and stricter safeguards for the program, the Obama administration issued the PPG. Hallmarks of the PPG included high-level vetting for individual strikes and certain constraints, including limiting lethal action to individuals deemed by the executive branch to pose a "continuing, imminent threat to U.S. persons." However, the PPG undermined those protections by expansively defining use-of-force standards and by permitting various exceptions for what the administration deemed "extraordinary cases."

20. In 2017, the Trump administration replaced the PPG with a set of rules called the PSP, which scaled back several of the PPG's protections for civilians. In particular, the PSP ended the already broad "continuing, imminent threat to U.S. persons" requirement, loosened standards for ensuring the targeted individual was actually present, and delegated authority to regional military commands and agencies without higher-level bureaucratic or presidential review. With the PSP in place, the Trump administration more than tripled the number of strikes carried out in Yemen and Somalia compared to the year before. Jessica Purkiss, *Trump's First Year in Numbers: Strikes Triple in Yemen and Somalia*, Bureau of Investigative Journalism (Jan. 19, 2018), https://www.thebureauinvestigates.com/stories/2018-01-19/strikes-in-somalia-and-yemen-triple-in-trumps-first-year-in-office.

21. While the PPG and PSP were initially classified, previous administrations eventually released redacted versions of them in response to FOIA litigation brought by the ACLU and the New York Times.

22. At the beginning of his term, President Biden initiated a review of the PSP and the government's lethal-force policies, and he reportedly imposed temporary limits on the use of drone strikes outside of war zones, including by requiring White House approval for strikes instead of the PSP's delegation of authority to regional commands and other less-senior officials.

23. On October 7, 2022, the New York Times, citing an unnamed senior official, reported that President Biden had signed a final lethal force policy and an accompanying counterterrorism strategy memorandum to formalize a new set of rules to supplant the Trump administration's PSP rules. *See* Savage Article. The White House also later publicly notified Congress of these changes. White House, Notification of a Change to the Legal and Policy Frameworks for the United States' Use of Military Force and Related National Security Operations (2022), https://www.whitehouse.gov/wp-content/uploads/2022/11/1264-Report-Nov-15-2022-unclass-notification.pdf [hereinafter "White House Notification"]. These new rules—contained in the PPM—now govern the United States' use of lethal force outside of conventional war zones. The PPM applies in countries like Somalia, Yemen, and Afghanistan (following the September 2021 U.S. withdrawal of forces there).

24. Although the PPM remains classified, senior administration officials have anonymously described the new rules to the press in ways that suggest they are the same as or similar to the PPG and PSP rules that previous administrations made public. *Id.* All three sets of rules—the PPG, PSP, and PPM—attempt to regulate the use of lethal force outside of recognized war zones. Like the PPG, the PPM applies to individuals located "outside areas of active

6

hostilities" and takes into account "consent" to the use of force by the governments of the countries in which it applies.

25. Also like the PPG and PSP, the PPM creates a bureaucracy to govern the decision-making process, delineates specific standards—with exceptions also included—for use of force or capture, and includes legal and policy justifications.

26. With respect to the bureaucratic decision-making process that governs the use of lethal force abroad, the New York Times reported that the PPM represents a return to the PPG's "more centralized control of decisions about targeted killing operations." *Id.* Unlike the PSP, which generally gave military commanders greater "flexibility" to approve targets, the PPG implemented an interagency review process before a target could be approved. Similarly, a senior administration official described the PPM nomination process to journalist Spencer Ackerman as akin to the PPG's "disposition matrix," in which the nomination "filters up from the national-security bureaucracy" to senior officials and then either to the defense secretary or the CIA director before reaching the president. Spencer Ackerman, *Joe Biden's Disposition Matrix*, Forever Wars (Oct. 31, 2022), https://foreverwars.ghost.io/joe-bidens-disposition-matrix-extrajudicial-drone-murder.

27. The PPM also reportedly restores some of the minimal safeguards for civilians that the PPG introduced and the PSP loosened or abandoned. *See* Savage Article. In particular, the PPM appears to reinstate the PPG's controversial requirement that strikes may be conducted if an individual poses a "continuing, imminent threat to U.S. persons" and when capture is deemed infeasible. The PPM also mirrors the PPG's "near certainty" standards for when a target is present, and that the target is assessed to be a member of a terrorist group. *Id.* (The PSP, by contrast, reportedly only required a lower standard of "reasonable certainty" for the presence of a terrorism

suspect.) For civilians, the PPM maintains the PPG's "near certainty" requirement that no civilians would be harmed in the attack—a standard that the PSP also maintained, while permitting it to be loosened for civilian adult males. Like the PPG, the PPM also does not authorize "signature strikes," where the U.S. government was authorized to kill targets matching certain behavioral profiles even when their individual identities were unknown. *Id.*

28. Like both sets of rules that came before it, the PPM contains exceptions and loopholes that are reflected in the administration's public justifications and actions. Notably, the PPM reportedly authorizes a different lethal force approval process—e.g., not requiring White House approval—and standards for strikes conducted in "collective self-defense" of U.S. or partner forces.

29. The "collective self-defense" theory is a novel and controversial justification that the military has frequently and publicly relied upon in Somalia. *Id.*; *see* Sarah Harrison, *What the White House Use of Force Policy Means for the War in Somalia*, Just Sec. (Oct. 20, 2022), https://www.justsecurity.org/83642/white-house-use-of-force-policy-and-somalia. For example, as recently as February 10, the United States Africa Command reported that it "conducted a collective self-defense strike" against Al Shabaab fighters near Galcad, Somalia. Even though Somalia is "outside an area of active hostilities" like other countries covered by the PPM, the PPM applies looser "collective self-defense" rules there. The Somali government has already recognized the application of these new PPM rules, and has reportedly requested that the Biden administration further expand its definition of "collective self-defense" to allow U.S. military operations against groups of Al Shabab militants, who might pose a threat and regardless of if they are presently firing at Somali forces. Charlie Savage et al., *Somalia Asks U.S. to Step Up Drone Strikes Against*

*Qaeda-Linked Fighters*, N.Y. Times (Oct. 27, 2022), https://www.nytimes.com/2022/10/27/us/politics/somalia-shabab-us-strikes.html.

30. Contrary to its predecessors, the Biden administration continues to shroud the government's lethal force rules in secrecy, despite promising to "promot[e] greater transparency and accountability" in its National Security Strategy. White House, National Security Strategy (2022), https://www.whitehouse.gov/wp-content/uploads/2022/10/Biden-Harris-Administrations-National-Security-Strategy-10.2022.pdf. As a result, the Biden administration exacerbates the U.S.'s already secretive and unaccountable use of lethal force abroad—in countries where Congress did not authorize it.

31. Over four administrations, the executive branch's use of lethal force abroad has exacted an appalling toll on Black, Brown, and Muslim civilians in multiple parts of the world. Despite these grave human rights consequences, the U.S. campaign of lethal strikes has largely evolved without meaningful congressional or public oversight.

32. The public has a right to know the rules yielding these disastrous consequences. The reported changes to the government's rules governing the use of lethal force abroad are the subject of widespread media attention and public controversy. To provide the American public with information about the Biden administration's lethal strike policies, the ACLU seeks the release of the PPM.

## The FOIA Request

33. On December 8, 2022, the ACLU submitted identical FOIA Requests to the DOD (specifically, its component the Office of the Secretary of Defense and Joint Staff), the CIA, the DOJ (specifically, its components the Office of Legal Counsel, the Office of Information Policy, the Office of the Attorney General, the Office of the Deputy Attorney General, and the National

9

Security Division), and the State Department seeking the release of "[t]he Biden administration's rules governing the government's use of lethal force abroad, known as the 'Presidential Policy Memorandum' and any documents attached thereto, as well as any summaries or descriptions of the Presidential Policy Memorandum," and "[a]ny memoranda since January 1, 2016 concerning the president's 'authorities to use force' under domestic and international law, including in particular the asserted authority to use force in 'collective self-defense.'" Request at 8–9. The Request clarified that it "should be construed to include the record containing the Biden administration's rules governing the use of lethal force as described in Part I [of the Request], even if the final version of this document bears a different title or form than that specifically requested." Request at 8 n.37.

34. Plaintiffs sought expedited processing of the Request on the ground that there is a "compelling need" for these records because the information requested is urgently needed by an organization primarily engaged in disseminating information in order to inform the public about actual or alleged federal government activity. 5 U.S.C. § 522(a)(6)(E).

35. Plaintiffs sought a waiver of search, review, and reproduction fees on the ground that disclosure of the requested records is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii).

36. Plaintiffs also sought a waiver of search and review fees on the grounds that the ACLU qualifies as a "representative of the news media" and that the records are not sought for commercial use. *Id.* § 552(a)(4)(A)(ii).

Defendants' Responses to the Request

37. Despite the urgent public interest in the PPM, none of the Defendants has released any record in response to the Request. Some of the Defendants have granted the ACLU's requests for expedited processing and waiver of fees, while others have denied or failed to respond to those same requests.

38. Under the FOIA, Defendants have twenty working days to respond to a request. 5 U.S.C. § 552(a)(6)(A)(i). If there are "unusual circumstances," an agency may extend the time limit by no more than ten working days. *Id.* § 552(a)(6)(B)(i). More than thirty working days have passed since Plaintiffs filed the Request. Thus, these statutory time periods have elapsed.

## DOD

### *Office of the Secretary of Defense and Joint Staff*

39. By letter dated December 9, 2022, the DOD Office of Freedom of Information acknowledged receipt of the Request to the Office of the Secretary of Defense and Joint Staff on December 9, 2022, and assigned it tracking number 23-F-0216. The Office denied Plaintiffs' request for expedited processing and deferred its decision on Plaintiffs' request for fee waiver.

40. The Office of Freedom of Information additionally informed Plaintiffs that because of "unusual circumstances that impact [its] ability to quickly process [Plaintiffs'] request," it would not be able to respond within the twenty-day statutory time period under the FOIA.

41. To date, the Office of the Secretary of Defense and Joint Staff has neither released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the Office of the Secretary of Defense and Joint Staff has failed to comply with the time limit for responding to the Request under the FOIA.

42. DOD continues to wrongfully withhold the requested records from Plaintiffs.

*CIA*

43.     By letter December 22, 2022, the CIA acknowledged receipt of the Request on December 14, 2022, and assigned it tracking number F-2023-00447. The CIA granted Plaintiffs' request for expedited processing and fee waiver.

44.     To date, the CIA has neither released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the CIA has failed to comply with the time limit for responding to the Request under the FOIA.

45.     The CIA continues to wrongfully withhold the requested records from Plaintiffs.

*DOJ*

*Office of Legal Counsel*

46.     By letter dated December 21, 2022, the Office of Legal Counsel acknowledged receipt of the Request on December 9, 2022, and assigned it tracking number FY23-016. The Office of Legal Counsel denied Plaintiffs' request for expedited processing and deferred its decision on Plaintiffs' request for fee waiver.

47.     The Office of Legal Counsel "tentatively" assigned the Request to the "complex" processing track, and noted that it "likely will be unable to comply with the twenty-day statutory deadline for responding to [Plaintiffs'] request."

48.     To date, the Office of Legal Counsel has neither released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the Office of Legal Counsel has failed to comply with the time limit for responding to the Request under the FOIA.

49.     The Office of Legal Counsel continues to wrongfully withhold the requested records from Plaintiffs.

*Office of Information Policy, Office of the Attorney General,*

*and Office of the Deputy Attorney General*

50. By letter dated December 16, 2022, the Office of Information Policy, on behalf of the Offices of the Attorney General and the Deputy Attorney General, acknowledged receipt of the Request on December 8, 2022, and assigned it tracking number FOIA-2023-00337 DRH:GMG. The Office of Information Policy denied Plaintiffs' request for expedited processing, but did not address Plaintiffs' request for a fee waiver.

51. To date, none of these offices has released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the Office of Information Policy, the Office of the Attorney General, and the Office of the Deputy Attorney General have failed to comply with the time limit for responding to the Request under the FOIA.

52. The Office of Information Policy, the Office of the Attorney General, and the Office of the Deputy Attorney General continue to wrongfully withhold the requested records from Plaintiffs.

*National Security Division*

53. By email dated January 17, 2023, the National Security Division acknowledged receipt of the Request on December 8, 2022, and assigned it tracking number FOIA/PA #23-088. In the letter, the National Security Division denied Plaintiffs' request for expedited processing, but did not address Plaintiffs' request for a fee waiver.

54. To date, the National Security Division has neither released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the State Department has failed to comply with the time limit for responding to the Request under the FOIA.

55. The National Security Division continues to wrongfully withhold the requested records from Plaintiffs.

*State Department*

56. By email dated December 20, 2022, the Requester Communications Branch of the Office of Information Programs and Services acknowledged it had received the Request on December 14, 2022, and assigned it case control number F-2023-02894. The letter denied Plaintiffs' request for expedited processing and granted Plaintiffs' request for a fee waiver.

57. To date, the State Department has neither released responsive records nor explained its failure to do so. Plaintiffs have exhausted all administrative remedies because the State Department has failed to comply with the time limit for responding to the Request under the FOIA.

58. The State Department continues to wrongfully withhold the requested records from Plaintiffs.

**CAUSES OF ACTION**

59. The failure of Defendants to make a reasonable effort to search for records responsive to the Request violates the FOIA, 5 U.S.C. § 552(a)(3), and Defendants' corresponding regulations.

60. The failure of Defendants to promptly make available the records sought by the Request violates the FOIA, 5 U.S.C. § 552(a)(3)(A), (a)(6)(A), and Defendants' corresponding regulations.

61. The failure of Defendants to process Plaintiffs' request expeditiously and as soon as practicable violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and Defendants' corresponding regulations.

62. The failure of Defendants to grant Plaintiffs' request for a waiver of search, review, and duplication fees violates the FOIA, 5 U.S.C. § 552(a)(4), (a)(6), and Defendants' corresponding regulations.

63. The failure of Defendants to grant Plaintiffs' request for a limitation of fees violates the FOIA, 5 U.S.C. § 552(a)(4), (a)(6), and Defendants' corresponding regulations.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Order Defendants to conduct a thorough search for all responsive records;

B. Order Defendants to immediately process and release any responsive records;

C. Enjoin Defendants from charging Plaintiffs search, review, or duplication fees for the processing of the Request;

D. Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

E. Grant such other relief as the Court deems just and proper.

March 8, 2023

Respectfully submitted,

/s/ Brett

Brett Max Kaufman (D.C. Bar No. NY0224)
Shaiba Rather (*pro hac vice* application forthcoming)
American Civil Liberties Union Foundation
125 Broad Street—18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bkaufman@aclu.org
srather@aclu.org

/s/ Hina Shamsi

Hina Shamsi (D.C. Bar No. MI0071)
American Civil Liberties Union Foundation

15

125 Broad Street—18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
hshamsi@aclu.org

*Counsel for Plaintiffs*